UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN ANDERSON,

                              Plaintiff,

              - against -

METRO-NORTH COMMUTER RAILROAD
COMPANY and INTERNATIONAL
BROTHERHOOD OF TEAMSTERS LOCAL 808,

                              Defendants.

**OPINION AND ORDER**
18 Civ. 6152 (ER)

Ramos, D.J.:

Steven Anderson brings this hybrid action under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, against his former employer, Metro-North Commuter Railroad Company ("Metro-North"), and his former union, International Brotherhood of Teamsters Local 808 ("Local 808") (together, "Defendants"), claiming that Metro-North breached its collective bargaining agreement ("CBA") with Local 808 when it terminated him on June 4, 2014, and that Local 808 thereafter failed to fairly represent him.  Doc. 1, Complaint.  Before the Court are Metro-North's and Local 808's motions for summary judgment, Docs. 46, 50.  For the reasons set forth below, the motions are GRANTED.

I.     **Factual Background**[1, 2]

       a)  **The CBA**

---

[1]The Court assumes familiarity with the facts and procedural posture of this action, previously set forth in its April 24, 2019 Order, which denied Metro-North's motion to dismiss.  Doc. 21.

[2] These facts are taken from the parties' Rule 56.1 statements or from excerpted pages from the collective bargaining agreement between Metro-North and Local 808.

Anderson worked for Metro-North from May 2006 until his termination in June 2014. For the final three years of his employment, he was a track foreman.  Doc. 54, Anderson's Response to Defendants' Rule 56.1 Statements.  ¶¶ 1–2.  During the entirety of his tenure, Anderson was a member of Local 808.  *Id.* ¶ 3.  The CBA between Metro-North and Local 808 governed Anderson's employment.  *Id.*  Rule 28 of the CBA, which covers unexcused employee absenteeism, provides:

> (a) An employee unable to report for work for any reason must notify his supervisor as soon as possible.
>
> (b) Except for sickness or disability, or under circumstances beyond his control, an employee who is absent in excess of fourteen (14) consecutive days without receiving permission from his supervisor will forfeit all seniority under this Agreement.  The employee and the General Chairman will be furnished a letter notifying them of such forfeiture of seniority. The employee or his representative may appeal from such action under Rule 27, Section 3.

*Id.* ¶ 4.  The parties agree that if an employee forfeits seniority rights under Rule 28 of the CBA, the employee's employment with Metro-North is terminated.  *Id.* ¶ 5.  Paragraph 2, Section 3 of Rule 28(b)[3] states "[e]xcept as otherwise specified, all references to number of days in this Agreement means calendar days."  *See* Doc. 56-1, Select Pages from the CBA, at MNR000169. Rule 10 of the CBA further guarantees Local 808 members two rest days out of each seven days, which must be consecutive to the extent possible given the needs of service.[4]  *See id.* at MNR000188–91.

---

[3] This section of Rule 28 was provided as an attachment to Metro-North's October 22, 2021 reply memorandum in support of its motion, Doc. 57.

[4] Metro-North also maintains a policy applicable to union employees that that governs "unsatisfactory attendance," which is set forth in Metro-North's Operating Procedure for Represented Employees (the "OPRE").  *See generally* Doc. 53-8, the OPRE; *see also* Doc. 54 ¶ 105.  The OPRE expressly excludes absences authorized by FMLA from the definition of unsatisfactory attendance.  Doc. 54 ¶ 105.  The OPRE provides that an initial instance of unsatisfactory attendance will result in a warning letter and close monitoring of the employee's attendance.  *Id.* During the next 12 months following such warning letter, an employee who uses more than two sick days within any 60-day period will be subject to disciplinary charges contained in a written "Notice of Investigation" or "Notice of Action."  Doc. 53-8 at MNR000681.  The penalties under the four stages of progressive discipline under the OPRE range from a reprimand to termination depending on the frequency of the charges and whether the employee admits

Rule 27, Section 3, subsection (a) of the CBA states that:

 "Appeal from discipline must be made, in writing, by the employee or on his behalf by his union representative to the Director-Labor Relations within fifteen (15) days after receipt of written notice of discipline.  This appeal, when the discipline imposed is suspension, shall act as a stay (except in the case of a major offense) in imposing the suspension until after the employee has been given a hearing."

Doc. 54 ¶ 6.

### b) December 27, 2013 through March 19, 2014:  FMLA Leave and Related Correspondence

On December 27, 2013, Metro-North approved Anderson to take 480 hours of leave (the equivalent of sixty 8-hour days) on an intermittent basis during the year-long period covering September 6, 2013 and September 5, 2014 to care for his wife and newborn child, pursuant to the FMLA.  *Id.* ¶ 10.  Anderson was thereafter on leave from Thursday January 2, 2014 through Saturday March 1, 2014 pursuant to his FMLA leave.  *Id.* ¶ 11.

On March 4, 2014, Plaintiff attended a mandatory return-to-work physical at Metro-North's Occupational Health Services ("OHS").  *Id.* ¶ 12.  At that examination, Anderson completed a form, indicating that he did not have any medical problems that he wanted to discuss and that since his last visit to OHS, he had not experienced any of the listed medical conditions, including "Back Trouble."[5]  *Id.* ¶ 13.  OHS cleared Anderson to return to work, but

---

[5] During his March 3, 2020 deposition, Anderson claimed to have suffered recurring back pain since he was involved in a motor vehicle accident in 2011.  *See* Doc. 47-1, Anderson's March 3, 2020 Deposition Transcript, at 65:10–15 ("I have had back issues since the car accident I was in in 2011.  So I have had an an on and off experience with my back issue my entire career.").  The record before the Court, however, does not indicate that Anderson ever informed Metro-North of his back troubles prior to May 15, 2014, when Metro-North received a note from Anderson's chiropractor, Dr. Nadine Beach, dated May 7, 2014, to excuse Anderson from work for days previously missed on March 20, 21, and 26, 2014 due to "spinal conditions."  Doc. 54 ¶ 73.

guilt and signs a waiver or proceeds to trial and is found guilty.  Doc. 54 ¶ 105.  "[T]he progressive discipline elements under [the OPRE, however, do not] apply to" "[e]mployees who fail to report for a scheduled tour of duty without providing notification[;]" such employees "may be subject to disciplinary action up to and including dismissal."  *See* Doc. 53-8 at MNR000682.

for the 15-day period from March 4 date through March 19, 2014, Anderson came to work only twice.  *Id.* ¶¶ 14–15; *see also* Doc. 47-9, Cordero's March 21, 2014 Email Thread with Jeffers, at 1–3 (reflecting the dates on which Anderson used all 480 of his FMLA hours). On March 19, 2014, a member of Metro-North's Human Resources Department, Sarah Cordero, spoke with Anderson by phone and notified him that as of March 18, 2014, he had exhausted his 480 hours of FMLA leave.  Doc. 54 ¶ 16.  During that call, Anderson asked if he could extend his FMLA leave or if there was "any other way that [he] could be out of work without losing [his] employment."[6]  *See* Doc. 47-1, March 3, 2020 Anderson Deposition Transcript, at 60:6–15. Cordero advised that he should "speak with his department regarding any accommodations he may need."  Doc. 47-9, Cordero's March 21, 2014 Email to Jeffers, at 1.

After Anderson exhausted his FMLA leave, Tracy-Ann Jeffers, who was then an employee availability specialist at Metro-North, was tasked with tracking Anderson's attendance and thereafter followed her typical practice of taking detailed notes on Anderson's attendance and attendance-related communications in a chronology.  *See generally* Doc. 47-14, Jeffers Chronology; *see also* Doc. 54 ¶ 27.  If Anderson was unable to report for his regular shift, he was required to notify his supervisor, James Brown, or call Brown's assistant supervisor or the

---

[6] During his deposition, Anderson could not recall whether he told Cordero about his back issues.  Doc. 47-1 at 61:8–17.

departmental timekeeper (together, the "Points of Contact") before the start of the shift.[7, 8, 9]  *Id.*

¶ 20.  If no one answered, Anderson was required to leave a voice message.[10]  *Id.* ¶ 21.

### c) March 20 through April 29, 2014:  Absences, Absence Coding, and Related Correspondence

For the 41-day period between March 20 and April 29, 2014, Anderson reported to work

on only six days.  Doc. 54 ¶ 28.  On fifteen other days, Anderson was absent but notified Metro-

North by phone or text message.[11]  *See id.* ¶¶ 37–45, 50–53, 58–59; *see also* Doc. 47-14, Jeffers

Chronology, at MNR000002.  On eight other days during this period, Anderson neither reported

for work nor notified one of the Points of Contact of his intended absence.[12, 13]  *Id.* ¶¶ 29–36, 46–

49, 54–57; *see also* Doc. 47-14 at MNR000002.

---

[7] During the time Anderson was employed by Metro-North, timekeepers were trackworkers who requested or were assigned to perform a timekeeping function.  Doc. 54 ¶ 107.

[8] Anderson's supervisor, Brown, was suspended in April 2015 for failing to "catch" fraudulent records prepared by an employee under his supervision who did not actually attend work as he had represented.  Brown served 60 days unpaid suspension for that offense.  *See* Doc. 53-2, Brown's February 5, 2020 Deposition Transcript, at 18:17–29:16.  He was also terminated in 2016 for an infraction related to "incorrect [inspection] paperwork," though he was ultimately reinstated following appeal.  *See id.* at 8:24–10:15.  After being reinstated, Brown has had no other disciplinary incidents.

[9] Anderson argues that he could have also notified Jeffers.  *See* Doc. 54 ¶ 20.  As further explained herein, whether Jeffers was or was not a Point of Contact does not change the outcome of this Opinion, as the Record shows that Anderson did not contact Jeffers—or any other defined Point of Contact—during the period of unexcused absence that resulted in his termination.

[10] Anderson contends that as an alternative to calling or leaving a voice message, he could have also sent a text message to inform a Point of Contact of his inability to report for his regular shift.  *See id.* ¶ 20.  Although Rule 28 of the CBA does not expressly deem text messaging an appropriate form of notification, neither Metro-North nor Local 808 argue otherwise.

[11] Jeffers' records for March 25, 2014 shows that Anderson texted "another supv requesting a PD [personal day] of 3/22/14.  The PD was approved by the supv."  *See* Doc. 47-14 at MNR000002.

[12] A note from Anderson's chiropractor, Dr. Nadine Beach, dated May 7, 2014, stated that Anderson was unable to perform his usual work on three of these eight days (i.e., March 20, 21, and 26, 2014) due to spinal conditions.  Doc. 54 ¶ 73; *see* Doc. 47-19, Dr. Beach's May 7, 2014 Note.  With the May 7, 2014 note, Local 808 filed a grievance with Metro-North to adjust these absent without leave charges against Anderson.  *See* Doc. 60, Local 808's Response to Anderson's 56.1 Statement, ¶ 126.

[13] Anderson was not scheduled to work for 12 days during the 41-day period between March 20 and April 29, 2014.  Doc. 54 ¶¶ 29–59.

Documents produced during discovery revealed that for each entry in Jeffers' chronology reflecting that Anderson called his department during this period, there is a corresponding record of Anderson having made that call in his cellphone records.  *See* Doc. 54 ¶¶ 37–45, 50–53, 58–59.  Similarly, for each entry in Jeffers' chronology reflecting that Anderson was a "no call, no show" during this period, there is no relevant call reflected in Anderson's cellphone records.  *See id.* ¶¶ 29–36, 46–49, 54–57.

Timekeepers, however, appear to have made mistakes in recording the reason for *why* Anderson was absent on certain days during this period.  In her deposition, Jeffers discussed a report that she generated to track Anderson's FMLA leave from November 12, 2013 through April 8, 2014.[14, 15]  *See* Doc. 53-4, Jeffers' February 5, 2017 Deposition Transcript, at 67:4–68:20.  This report included absence codes entered by timekeepers to explain the reason for each of Anderson's absences.  *See id.* at 69:2–5.  The code "XW," for example, represented that he was "absent without permission," and "XD" represented "sick [day]."  *See id.* at 69:8–9, 79:4–5.  In the report, Jeffers struck some of the absence codes with a handwritten line drawn through them because the timekeeper had entered the incorrect code.[16]  *See id.* at 69:21–70:4.  This was true for three entries, on March 20, 21, and 25, 2014, which were inadvertently marked "XD" (sick day) when they should have been marked "XW" (absent without permission).  *See id.* at 69:21–70:4.  Though Jeffers could not remember at the time of her deposition why the codes initially entered by the timekeepers were incorrect, *see id.* at 70:19 –22, her chronology indicates

---

[14] Neither of the parties have produced a copy of this report.

[15] During her deposition, Jeffers said that could not recall when she generated this report.  *See* Doc. 53-4, Jeffers' February 5, 2017 Deposition Transcript, at 68:11–13.

[16] When asked "who struck the . . . time code description," Jeffers said that she "probably . . . did" and did not suggest that anyone else struck them or could have struck them.  *See id.* 70:9–11.

that Brown advised her that Anderson had not "called or showed up for work" on either March 20 or March 25, 2014, *see* Doc. 47-14 at MNR000003.[17]

In her deposition, Jeffers also discussed another, three-page report further describing some of Anderson's absences during this period.[18]  See Doc. 53-4 at 73:9–22.  Jeffers generated the report but could not recall why.  *Id.* at 73:23–25.  This report also contained absence codes entered by timekeepers.  Codes for three consecutive dates were corrected by hand, but Jeffers could not recall whether she was the one who made the corrections.  *See id.* at 74:2 –75:8.  One correction specified that the absence code for April 7, 2014 should "be deleted [because t]his is an employee rest day."  *See id.* at 74:2–5.  Someone also crossed out the absence code entry for April 8, 2014.[19]  *See id.* at 74:13–16.  And for April 9, 2014, someone crossed out the code for a personal day (coded "PD") and replaced it with: "[E]mployee's out of PD time.  Department advised this cannot be coded as PD."[20]  *See id.* at 74:24–75:8.

By letter dated April 16, 2014, Metro-North sent Anderson a "Notice of Action," charging him with "unsatisfactory absenteeism" in light of his fifteen unexcused absences between November 12, 2013 and April 4, 2014.[21]  *See* Doc. 53-9, the Notice of Action.[22]  Such

---

[17] Jeffers' chronology does not explain why the March 21, 2014 coding was changed.  *See* Doc. 47-14 at MNR000003.

[18] Neither of the parties have produced a copy of this three-page report.

[19] Though not entirely clear from Jeffers' deposition transcript, it appears that this entry was revised to reflect a personal day.  *See* Doc. 53-4 at 74:13–16 ("And then the following entry on April 8th is crossed out and it says Employee took a PD.  I would assume that means personal day for this day.  And it's crossed out.").

[20] During his deposition, Anderson testified that he witnessed Brown and other supervisors improperly instruct timekeepers to change absence codes so that employees could be reprimanded, denied pay, or terminated.  *See* Doc. 47-1 at 178:21–181:2.

[21] These dates are November 12, 13, 14, 15, 16, 19, 21, 22, 2013; March 20, 21, and 26; and April 3, 4, 5, and 8, 2014.

[22] The letter also set a hearing date for April 25, 2014, *see* Doc. 53-9, which was later rescheduled to May 7, 2014 by way of an April 29, 2014 letter, *see* Doc. 54 ¶ 119.  The Record does not show that the hearing ever took place. Indeed, Anderson was absent without notifying a Point of Contact on May 7, 2014.  *See* Doc. 47-14 at MNR000002; *see also* Doc. 54 ¶¶ 60, 64.

notices were sent to employees to advise them of an attendance violation, the dates they were

absent, and the date of the hearing concerning those charges.  Doc. 54 ¶ 106.  The April 16, 2014

letter was copied to Anderson's union representative, Fitzverity Silvera.  *Id.*

### d)  April 30 through May 18, 2014:  Consecutive Days of Unexcused Absence and Related Correspondence

For the 14 days between April 30 and May 13, 2014, after he was sent the Notice of

Action, Anderson did not report for any of his scheduled shifts.  *Id.* ¶¶ 60, 64.  Both Jeffers'

chronology and Anderson's cellphone records show that Anderson failed to call any of the Points

of Contact to advise them that he would be absent during this period.  *Id.* ¶¶ 61–63, 65.  On May

13, Jeffers emailed Melanie Chirico, her supervisor and Metro-North's Assistant Director of

Administration, to inform her that James Brown had notified Jeffers that Anderson had not

reported to work or called into his department for 14 consecutive days.  *See* Doc. 53-4 at 98:16–

99:5.  On May 13, 2014 at 1:01 p.m., Anderson called Jeffers and left her a voicemail, saying:

> "Hi.  This message is for Tracy Jeffers.  This is Steve Anderson.  I'm just calling
> to ask you a question.  I've been out for a few days, and I want to know if that I --
> I have to schedule a return-to-work medical physical.  I'm not really sure of the
> actual cut off for maybe -- I had an issue with my wife where she had emergency
> surgery where we had to actually stop the birth, you know, of our child going
> forward.  So we're a little bummed right now, and I haven't contacted anybody.
> It was an ectopic pregnancy and we had to stop that process in order to keep my
> wife okay.  So if you could please contact me back or leave a message if I don't
> answer and I will contact you back as soon as I can. . . . Thank you very much."

Doc. 54 ¶ 120; *see also* Doc. 47-14 at MNR000002.  On May 15, 2014, Anderson left another

voicemail for Jeffers, advising:

> "Hey, Tracy. Good morning.  This is Steven Anderson.  It's 8:00 on Thursday
> morning.  I left you a message yesterday and I'm sure you're very busy.  I just
> wanted to touch base and just -- I guess I'm going to return to work tomorrow.  I
> guess I'm not past the threshold of, you know, needing another physical or
> whatever the case may be.  That's why called just to make sure I didn't have to do
> that.  This way I didn't, you know, show up for work and everybody looks at me
> and says, "hey, you got to go over here."  So just to avoid that situation, I wanted

> to confirm with you I will be returning to work tomorrow morning.  As I stated, I did have a very personal matter with my wife and I and our baby.  And if you could, we would appreciate a call back just so I have an idea of what's going on. . . . Thank you very much."

Doc. 54 ¶ 121; *see also* Doc. 47-14 at MNR000002.  Later that day, Jeffers told Anderson that because he had been absent for more than 10 days, he needed to submit to a return-to-work physical.  *See* Doc. 47-14 at MNR000003.  The appointment was scheduled for May 16, 2014.  *Id.*  That same day, Anderson again called Jeffers to say that he would not be able to make it to the May 16 appointment due to his wife's condition.  *Id.*  He requested that his appointment be changed to May 20, 2014, and Jeffers obliged.[23]  *Id.*

Also on May 15, 2014, Jeffers emailed David Treasure, who was then Vice President of Operations of Metro-North, explaining that Anderson had been "AWOL" (i.e., absent without official leave) for 14 days "and then call[ed] in on the 14th day."  Doc. 53-5.  Jeffers further wrote that "[t]his is an ongoing problem with this employee," and that Chirico—who was cc'ed on the email—was "in the process of drafting [a formal warning] letter."  *Id.*

That same day, Jeffers received a note from Anderson's chiropractor, Dr. Nadine Beach, which was dated May 7, 2014, stating that Anderson was unable to perform his usual work on March 20, 21, and 26, 2014 due to spinal conditions and that he should return to work on March 27, 2014.  Doc. 54 ¶ 73; *see also* Doc. 47-19, Dr. Beach's May 7, 2014 Note; *supra* n.12.

### e)  May 19 through May 20, 2014:  Formal Warning and Second Physical

On May 19, 2014, Metro-North sent Anderson a formal warning, which stated:

> From the dates of April 30, 2014 to May 13, 2014, you failed to report for your tour of duty from 8:00 am to 4:00 pm as required.  Additionally you failed to contact your immediate Supervisor or any other member of Management regarding your absence until the afternoon of 5/13/14. . . .  Please be advised that

---

[23] The record does not reflect that Anderson asked about options for further leave during any of these interactions with Jeffers.

conduct such as this going forward is disruptive to the productivity of this department and toward of the provision of service to our customers and may result in disciplinary action."

Doc. 54 ¶ 74.

During his scheduled May 20, 2014 medical examination, Anderson reported that he did not have any medical problems he wanted to discuss, and that since his last visit to OHS, he had not experienced any of the listed medical conditions, including "Back Trouble*." Id.* ¶ 76. Anderson was able to successfully complete a physical abilities test that required him to move a 20-pound box three feet and back 10 times within 45 seconds, and lift a 48-pound track jack and carry it 50 feet. *Id.* ¶ 78. Because OHS found that Anderson did not have any physical limitations, it cleared him to return to full work duty that day. *See id.* ¶ 79.

### f) May 21 through June 4, 2014: Anderson's Termination

For the 14-day period of May 21 through June 3, 2014, Anderson did not report to work for any of his scheduled shifts for any of the eleven days he was scheduled to work. *Id.* ¶¶ 80, 125. On June 7, 2014, Anderson received a letter dated June 4, 2014 (the "June 4 Letter") from Metro-North's then-Director of Track and Structures, which said:

> Our records indicate that you have been absent without permission since May 21, 2014. Since you failed to notify your supervisor of your inability to report to duty, you have forfeited all seniority rights under Rule 28 of the Agreement between Metro-North Railroad and the International Brotherhood of Teamsters, Local 808.

*Id.* ¶¶ 96–97. The June 4 Letter terminated Anderson. *See id.* ¶ 5, 126.

During his deposition, Anderson first maintained that he called "a few times [during] that time period" to notify one of the Points of Contact via either "a home phone or a cellphone" but that he could not remember when he called. Doc. 47-1 at 113:4–114:7. Upon further questioning, Anderson said that he believed he called from his cellphone. He further indicated

that there were "multiple numbers in [his cellphone]."  When asked if those numbers were saved as a contacts or if he manually dialed them, Anderson replied that "[the numbers] would be saved as [] contact[s]."  *See id.* at 183:11–21.  Neither Jeffers' chronology nor Anderson's cellphone records, however, show any calls from Anderson to any of the Points of Contact this period, or to any of the other phone numbers that Anderson identified as a number he would call to inform Metro-North of an absence.  *See* Doc. 54 ¶¶ 81–83, 93; *see also* Doc. 47-12, Anderson's Response to Metro-North's Second Set of Interrogatories, at 7 (reflecting the Metro-North contacts saved in Anderson's cellphone).  Anderson, furthermore, has not produced any text messages or records to establish that he notified, or attempted to notify, a Point of Contact— or any other Metro-North personnel—during that period.  Nonetheless, Anderson maintained during his deposition that he "wouldn't go 14 days without calling [his] job," though he could not recall to whom at Metro-North he spoke.  *See* Doc. 41-7 at 113:24–25, 176:9–177:8.

The same day he received the June 4 Letter, Anderson called Silvera, who was responsible for processing grievances on behalf of Local 808 members, to tell him that he had received the June 4 Letter.  *Id.* ¶ 126; *see also* Doc. 53-12, Silvera March 19, 2020 Deposition Transcript, at 109:8–12.  Anderson informed Silvera that had been out for those 14 days "due to his back."  Silvera asked Anderson whether he had a doctor's note.  Doc. 47-1 at 105:3–7.  Anderson said that he did not have a note at that time but that he would contact his chiropractor.  *See id.* at 105:9–14; 109:11–24.  Silvera told Anderson that he required a doctor's note before he could appeal Anderson's termination.  *See* Doc. 53-12 at 111:24–112:14.  Silvera does not recall ever receiving a note from Anderson's chiropractor, Dr. Beach, until after the commencement of the instant litigation.  *See id.* at 105:13–22.  Accordingly, Silvera never filed an appeal of Anderson's termination.  *See id.* at 111:3–13.

The record before the Court includes a doctor's note from Dr. Beach dated May 21, 2014 (the " May 21 Note").  *See* Doc. 47-25, May 21, 2014 Doctor's Note.  The May 21 Note provides that Dr. Beach administered chiropractic treatment to Anderson on May 21, 2014 and that Anderson should be excused from work from May 21 through June 4, 2014 "due to pain in the Cervical and Lumbar Spine."  *Id.*  During her deposition, Dr. Beach did not deny the possibility that she wrote the May 21 Note at some point after May 21 and simply dated it "May 21."  *See* Doc. 53-7 at 37:22–25 ("Q:  Is it possible that you wrote the document some time after May 21 and dated it on May 21?  A:  I don't, no, I don't know why.").  Nor could Dr. Beach say precisely when she first gave the May 21 Note to Anderson.  *See id.* at 38:6–11 (Q:  On or around May of 2014 did you give the document to Mr. Anderson?  A:  I would imagine usually when somebody asks more for it like I said either I will fax it directly to them or I will give it to the patient.").  Dr. Beach was also unable to recall any specific details regarding the condition of Anderson's back on May 21, 2014, *id.* at 39:8–14, beyond the high-level information recorded in her office visit notes, *id.* at 49:18–51:7 (indicating that Anderson self-reported a pain level of seven or eight out of ten).   Nor did Dr. Beach testify to having any record of producing the May 21 Note to Anderson.  *See generally id.*

Anderson testified in his deposition, however, that he did not receive the May 21 Note until after his termination—"[p]robably the week of June 4 or maybe the following week."  *See* Doc. 47-1 at 109:19–20.  Anderson further testified that he "probably" gave it to Silvera and that he "assume[s]" he gave it to Silvera.  *Id.* at 110:3–4.  According to Anderson, it was his "practice" to "e-mail [] or text message" "all of his other letters" to Silvera, but, to date, Anderson has produced no such records.  *Id.* at 110:8–15.  In his deposition, Anderson also testified that he never sent Metro-North a copy of the May 21 Note.  *See id.* at 111:21–24.

After the commencement of this litigation, the May 21 Note was produced by Dr. Beach as part of Anderson's complete medical file in response to a release signed by Anderson and requested by Defendants in this case.  Doc. 54 ¶ 100.

## II.   Procedural History

Anderson brought this hybrid RLA action on July 6, 2018, alleging breach of contract against Metro-North and breach of duty of fair representation against Local 808.  Doc. 1.  Local 808 answered the complaint, *see* Doc. 11, but Metro-North initially filed a motion to dismiss, *see* Doc. 17.  On April 24, 2019, the Court denied Metro-North's motion to dismiss.  *See* Doc. 21.  Discovery has now concluded, and pending before the Court are Metro-North and Local 808's motions for summary judgment to dismiss both of Andersons's claims.  *See* Doc. 46, Metro-North's September 2, 2021 Motion for Summary Judgment; Doc. 50, Local 808's September 3, 2021 Motion for Summary Judgment.

## III.   Legal Standard

### a.   FRCP 56(a) Motion for Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v.

Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However,

in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d

14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must

set forth significant, probative evidence on which a reasonable fact-finder could decide in its

favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256–57 (1986)).

IV.     **Discussion**

   a.  **Metro-North**

For the following reasons, the Court holds that no reasonable juror could find that Metro-

North's June 4, 2014 termination of Anderson violated the CBA. Therefore, Anderson's breach

of contract claim against Metro-North is dismissed.

   i.  **Interpretation of the CBA**

The parties agree that the CBA governed Anderson's employment. The parties further

agree, pursuant to Rule 28(a) of the CBA, that Anderson was required to notify one of the Points

of Contact if he was going to be absent from work on any given day. Rule 28(b) of the CBA

states that "except for sickness or disability, or under circumstances beyond his control, an

employee who is absent in excess of fourteen (14) consecutive days without receiving permission from his supervisor will forfeit all seniority under this Agreement," which, in turn, results in termination of employment.  Doc. 1 ¶ 4.  Paragraph 2, Section 3 of Rule 28(b) provides that "[e]xcept as otherwise specified, all references to number of days in this Agreement means calendar days."  Doc. 56-1 at MNR000169.

When interpreting a contract at the summary judgment stage, courts must give "[e]ffect and meaning . . . to every term of the contract, and [make] reasonable effort . . . to harmonize all of its terms."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (quoting Reda v. Eastman Kodak Co., 233 A.D.2d 914 (N.Y. App. Div. 1996)).  Here, Anderson contends that Rule 28(b) refers to 14 consecutive *work*days, since an employee cannot be absent on days he is not expected to work.  *See* Doc. 55, Anderson's Opposition, at 18–19.  But Metro-North argues—correctly in the Court's view—that constructing the provision as such would require ignoring Paragraph 2, Section 3 and which expressly provides that "all references to number of days in this Agreement means calendar days."  *See* Doc. 58, Metro-North's Reply, at 2–4.  If Rule 28(b) was to apply only to consecutive *work*days, then the drafters of the CBA could have so specified.  For that reason, the Court declines to adopt Anderson's interpretation of Rule 28(b).[24]

## ii.  Application of the CBA

---

[24] Metro-North also argues that because Rule 10 of the CBA generally guarantees members two rest days out of every seven days worked, members can *never* be absent from their regular shifts for 14 consecutive workdays.  *See* Doc. 58 at 2–3.  Thus, if Rule 28 applied only to consecutive workdays, the rule would never apply.  Metro-North argues that courts should avoid interpretations of contracts that would render a clause "superfluous or meaningless," and that construing "days" to mean "calendar days" avoids stripping Rule 28 of its practical effect.  *Id.* at 3 (quoting *Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016)).

Metro-North argues that its June 4, 2014 termination of Anderson did not violate the CBA because Anderson was absent in excess of 14 days beginning on May 21, 2014, without notifying one of the Points of Contact.  In response, Anderson argues that:  (1) he was only absent for 11 consecutive *work*days; (2) he was not absent in excess of 14 workdays; and (3) he notified a Point of Contact.  *See generally* Doc. 55, Anderson's Opposition.  As explained below, no reasonable juror could find that Metro-North's termination of Anderson violated the CBA.

Anderson's first two arguments are readily dispensed with.  First, as this Court has already concluded, Rule 28(b)'s prohibition of unexcused absences in excess of 14 days applies to calendar days, not workdays.  Therefore, Anderson's argument that he was only absent the 11 days he was required to work between May 21 and June 3, 2014 is of no moment.  Second, Anderson's absence exceeded 14 consecutive days.  Anderson was absent for each of the 14 days from May 21 through June 3 and was notified on June 4, the *fifteenth* calendar day, that he had been "absent without permission since May 21."  *See* Doc. 58 at 4 n.4; *see also* Doc. 54 ¶ 96. His absence therefore exceeded the 14-day threshold.

With respect to Anderson's third argument, there is no genuine issue of material fact over whether Anderson notified anyone at Metro-North of any of his absences between May 21 and June 3, 2014.  He provided no evidence of any such communication.

Caselaw makes clear that "a party cannot defeat a motion for summary judgment with mere speculation and conclusory assertions."  *Nguedi v. FRB of N.Y.*, 813 F. App'x 616, 617 (2d Cir. 2020) (summary order).  In *Mr. Baguette, Ltd. v. Fed. Express Corp.*, for example, the court granted a corporate-defendant summary judgment where the only factual issue was whether plaintiff reported a non-delivery within a 72-hour notice period, as required by contract.  No. 07 Civ. 7931 (GBD), 2010 WL 245572, at *3, *5 (S.D.N.Y. Jan. 22, 2010).  There, although the

employee swore under oath that he timely notified his employer, the employer's records did not reflect a timely phone call; nor could the employee produce phone records—or any other records—to evidence a timely notification. *See id.* at *3–5. Thus, the court granted summary judgment, reasoning that the "nonmovant's unsupported denials of the movant's evidence, without more, cannot create disputes of material fact." *See id.* at *4 (quoting *Delotch v. Wal-Mart Stores*, 06 Civ. 5483 (GEL), 2008 U.S. Dist. LEXIS 47590, at *5 (S.D.N.Y. June 16, 2008)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").

Here, as in *Baguette*, the sole basis for Anderson's contention that he notified a Point of Contact is his testimony that he "wouldn't go 14 days without calling [his] job." Doc. 41-7 at 113:24–25. But Anderson has produced no phone records showing that he made a call during that period. Nor has he produced any handwritten notes, voicemails, emails, text messages, or any record of any kind. Indeed, Anderson cannot remember with whom at Metro-North he allegedly spoke. Jeffers' chronology, as well as Anderson's cellphone records, also demonstrate his silence. Thus, far from providing concrete evidence, Anderson relies only on *ipse dixit*.

Nevertheless, Anderson contends that there exists genuine dispute over whether he provided Metro-North notice of his absence. As proof, he relies on: (1) the voicemails he left with Jeffers on May 13 and 15, 2014; (2) the May 7, 2014 and May 21, 2014 doctor's notes from Dr. Beach; (3) the fact that Metro-North's records are unreliable; and (4) the idea that he notified Metro-North through his home phone landline. For the following reasons, the Court maintains that no reasonable dispute exists.

### 1. The Voicemails

According to Anderson, the two voice messages he left for Jeffers on May 13 and 15, 2014 explained he was "absent and unable to work because his wife suffered an ectopic pregnancy," but despite this, Jeffers "add[ed] fuel to the fire [by] reiterat[ing] the charges of unsatisfactory attendance then pending against Plaintiff" in a "May 15, 2014 email to her supervisors."  *See* Doc. 55 at 22.

In the May 13 voicemail, Anderson said that he had been absent for "a few days" and asked if he needed "to schedule a return-to-work medical physical."  Doc. 54 ¶ 120.  He also noted that his wife had undergone emergency surgery and that he had not "contacted anybody." *See id*.  In the May 15 voicemail, Anderson advised Jeffers that he planned to work on May 16 and asked if he needed to come to OHS for a medical examination.  *See* Doc. 47-14 at MNR000002; *see also* Doc. 54 ¶ 121.  He also explained that he was dealing with a "very personal matter" with his family.  Doc. 54 ¶ 121.  After receiving his voice messages, Jeffers called Anderson back on May 15, 2014 and told him that because he had been absent for more than 10 days, he had to submit to a return-to-work physical, which was ultimately scheduled for May 20, 2014.  *See* Doc. 47-14 at MNR000003

The Record clearly shows that neither of Anderson's voicemails said that he would be unable to work between May 21 and June 3, 2014 or that he personally was suffering from an ailment of any kind.  Nor did Anderson request additional time off in either voice message.  To the contrary, Anderson stated that he intended to *return* to work on May 16, 2014.  The purpose of both voicemails was to ask whether he needed to submit to another physical—not to inform Metro-North of an upcoming stretch of absences.  For these reasons, Anderson's reliance upon the two voicemails he left for Jeffers is misplaced.

### 2.  The Doctor's Notes

Anderson's next allegation—that he "provided [] Silvera two [notes] from his treating chiropractor . . . [excusing] his absence[s] from May 21 until June, 2014," and that he "belie[ved] that [] Silvera conveyed that information to Metro-North"—is factually unsupported. *See* Doc. 55 at 21.  As an initial matter, the May 7, 2014 note is entirely irrelevant to the question at hand, as it purportedly provides a basis to excuse Anderson from work for three days in *March,* well before the unexcused absences that led to his termination.  *See supra* n.12.  Though the May 21 Note purports to excuse Anderson for the period of absence that resulted in his termination due to back pain, the Record does not contain any evidence that Anderson delivered the May 21 Note to Metro-North or Silvera.  Even the history surrounding the origin of the May 21 Note and when Anderson received it is unclear.

During her deposition, Dr. Beach testified that she could not recall when she wrote the May 21 Note, or when she gave it to Anderson.  Similarly, Anderson testified in his deposition that he could not recall when he received the May 21 Note from Dr. Beach; he claimed only that he "probably" obtained it during "the week of June 4 or maybe the following week."  Both Silvera and Anderson testified that as of June 7, 2014—the date Anderson received the June 4 Letter and spoke to Silvera— Anderson did not yet possess the May 21 Note.  Silvera also testified during his deposition that he did not recall ever receiving the May 21 Note from Anderson and thus never filed an appeal of his termination.  Critically, Anderson does not conclusively recall *ever* delivering the May 21 Note to Silvera; he testified only that he "probably" transmitted the note to Silvera and that he "assumes" he did so.  Anderson further explained that he typically sent along these kinds of notes to Silvera via email or text.  But to date, Anderson has failed to produce any emails or texts showing that he provided the May 21

Note to Silvera.  Anderson has also admitted that he never directly sent the May 21 Note to Metro-North.

Again, Anderson relies exclusively on his own testimony that he assumes that he sent the May 21 Note to Silvera.  This testimony, moreover, is based not on concrete memory—but on *assumption*.  As already explained, shaky recollection, without more, does not suffice to raise a genuine issue of material fact.[25]

### 3.  Metro-North's Record Keeping

Anderson also criticizes Metro-North's recordkeeping, making three key points:  (1) timekeepers failed to properly record the reason for some of his absences (referencing Jeffers' testimony regarding handwritten corrections to Anderson's absence codes for March 20, 21, and 25, and April 6, 7, and 8, 2014); (2) Brown and other supervisors routinely instructed timekeepers to change absence codes so that an employee could be reprimanded, denied pay, or terminated (referencing Anderson's deposition testimony about witnessing this practice); and (3) Brown is not a reliable source for reporting his attendance (referencing Brown's previous disciplinary charges).  *See* Doc. 55 at 20–22.

With respect to Anderson's first two points, the accuracy of his absence codes is entirely irrelevant to the question of whether he called Metro-North or was present at work.  If Anderson was absent, he was required to contact Metro-North.  As noted, Metro-North's and Anderson's records show that he never communicated, texted, or left a voicemail with a Point of Contact.

---

[25] Other facts cast further doubt on Anderson's testimony regarding his back issues.  On May 20, 2014—one day before Dr. Beach administered treatment and excused Anderson from work for two weeks—OHS cleared Anderson to return to work after he completed return-to-work physical.  At the physical, Anderson filled out a form in which he expressly indicated that he was not experiencing "Back Trouble."  And thereafter, he successfully completed a physical abilities test that required him to perform strenuous exercises, such as moving a 20-pound box three feet and back 10 times within 45 seconds.

Additionally, the Record shows that corrections were made only to absence codes for six days *predating* the period of absence that resulted in his termination.  With respect to Anderson's second point, he has also failed to produce any evidence beyond his own testimony that such practices ever occurred.

Anderson's criticism of Brown is similarly unavailing.  While it is true that Brown was disciplined for failing to catch fraudulent records prepared by an employee under his supervision and committed an infraction involving "incorrect [] paperwork," both of these offenses occurred *after* Anderson's termination and neither offense involved failing to properly report contacts by absent employees.  *See* Doc. 57 ¶ 111.  Even more importantly, these facts do not cast doubt on the consistency between Metro-North's records and Anderson's cellphone records.  From March 20 through May 14, 2014, for each entry in Jeffers' chronology reflecting that Anderson called his department during this period, there is a corresponding record of a call on Anderson's cellphone records.  Likewise, for each entry in Jeffers' chronology reflecting that Anderson was absent without permission, there is no relevant call reflected in Anderson's cellphone records.  Jeffers' notes are, moreover, corroborated by email correspondence and deposition testimony.  Accordingly, the Court finds that Anderson's criticism of Metro-North's record keeping does not raise any genuine issue of material fact.

### 4.  Calls from his Home Phone

In a final attempt to prove that he notified Metro-North during the period of absence that resulted in his termination, Anderson argues that calls from his home phone would not be reflected in cellphone records.  Anderson's own testimony, however, suggests that he never called Metro-North from a landline number from May 21 to June 4, 2014.  In his deposition, when asked if he notified Metro-North via his cellphone or home phone during this period,

Anderson testified, "I believe my cellphone," as he had Metro-North's phone numbers saved in his cellphone as contacts.  *See* Doc. 47-1 at 183:6–25.  Furthermore, and most critically, Anderson has not produced any evidence of phone calls from his home phone number to any Metro-North number during this period.

The Court therefore finds that no reasonable juror could find that Anderson notified a Point of Contact—or anyone at Metro-North—of his absence at any point during the period May 21 to June 4, 2014.  In light of the above, the Court hereby concludes that no genuine dispute exists over whether Metro-North's June 4, 2014 termination of Anderson violated the CBA.  Accordingly, Anderson's cause of action against Metro-North is dismissed.

### b.  Local 808

The parties agree that Anderson's cause of action against Local 808 cannot be sustained without a valid claim against Metro-North.  *See, e.g.*, *Musto v. Trans. Workers Union*, 818 F. Supp. 2d 621, 641 (E.D.N.Y. 2011) (granting summary judgment to employer and union defendants on hybrid action because no reasonable jury could conclude that employer breached the applicable collective bargaining agreement); *see* Doc. 55 at 16; Doc. 49 at 14.  Because the Court has dismissed Anderson's claim against Metro-North, so, too, does the Court dismiss his claim against Local 808.

## V.     Conclusion

For the foregoing reasons, the Defendants' motions for summary judgement are GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 46 and 50, and close the case.

It is SO ORDERED.

Dated:     August 24, 2022
           New York, New York

_____
Edgardo Ramos, U.S.D.J.